Page number 17-7073 Raymond McGovern Appellant v. Christopher Brown Badge number 018 and his individual and official capacities at L. Mr. Hayden Hilliard for the appellant, Mr. McConnell for the appellee. Good morning. May it please the court, Mara Verhaden Hilliard on behalf of Raymond McGovern Appellant and also present is Carl Messinia. At issue before the court is a very narrow question on appeal involving whether the offense of unlawful entry refusal to quit can lie in the absence of an express directive being given, an express directive to quit. The lower court erred in its ruling by determining that an express directive to leave the premises for unlawful entry refusal to quit is no longer required, and that a directive may be implicitly inferred instead. That ruling, were it to stand, would impact not only unlawful entry law in the District of Columbia, and it is a position that the D.C. Court of Appeals has never taken, has never held. The D.C. Court of Appeals has always required an express directive. So your argument, this case turns on, if we, looking at the record and looking at the video, think that Brown asked McGovern to leave, if that's the conclusion we come to, then your argument evaporates, right? I disagree, Your Honor. I believe that If we think that Brown asked McGovern to leave If this court were to determine that That's the hinge, isn't it? If we decided that he asked McGovern to leave, then the argument you have right now evaporates, right? If this court were to find, yes, that there was an express directive to leave that was issued, followed by a refusal to quit, that portion of the case, that addresses that portion of the case. There was also the issue of excessive force pending. The issue, in addition to the state of the law in terms of unlawful entry and the requirement that there be an express directive to quit, is also that the case law May I interrupt you? Yes. It seems to me, hypothetically possible, that an individual could go on premises for reasons other than whatever it is the premises are designed to allow individuals to come on, and go on to the premises with the purpose and the effect of doing something that is in violation of why the premises are open to the public. I keep thinking of all the labor cases, for example, grocery stores. People can go into the grocery stores to go shopping, but if they go into a grocery store to pick it, then that's a trespass. Why would you have, in that situation, why would you have to first tell them leave? Why couldn't you just have them usher down? In other words, it's the entry, not the refusal to leave once they've been directed to. Isn't that what occurred here? In this instance, Mr. McGovern, and it's not disputed, was a ticketed invited guest. In order to divest him of his right to be present, there's a requirement of revocation of that right through a directive to leave or a directive to quit. There are circumstances where a trespass might lie, where there are policies that are made known to a person in advance as to what is considered acceptable or unacceptable behavior. The university had a policy, and the policy, Mr. McGovern violated. Now, does the university have to read that? Didn't he have an obligation to discover what the rules of engagement were on the university property? Indeed, and in the record, Your Honor, the university's policy was both not, they acknowledged that it was not given or directed to the invitees or to people, it was not made known to them. The lower court acknowledged that. But there's a second issue there, too, which is what the university policy was varied from event to event. So there was no, and that is also in the record, there was no explicit policy as to what was considered acceptable or unacceptable behavior. Indeed, the deponents, the chief of police, the officers in this case testified that for some speakers, completely event to event and with no notice to the audience, standing up, and not only just standing up, but speaking out and engaging in back and forth might be welcome. So there was no way, no notice, no information given. Each decision was made case by case, event by event, as to what was going to be considered acceptable or unacceptable behavior. And in terms of the issue of a directive to quit, the lower court's ruling finding that I didn't, do you dispute that standing up with your back to the speaker in this case was unacceptable behavior? There, in fact, in the record and going through GW's own depositions and own policies, and we put this in the brief, yes, we do dispute. Because standing silently with a back turned. It wouldn't matter whether he was directed to leave or not. If that's your theory, that he wasn't violating any school policy. They would have the right to direct him to leave. Yes, they could make the decision on the spot that we don't like that and we want him to leave. But then they have to expressly divest him of his right to be present and, in fact, then direct him to leave. And your argument is when the officer said, sir, can you please come with me, that that was not a direction to follow the officer? That was not a directive to leave the premises. And the facts and circumstances surrounding that statement, which is what I was getting to, goes to these larger issues with U.S. v. Mendenhall, what this court has addressed in U.S. v. Wood and U.S. v. Castle, involving when a voluntary or consensual encounter transforms into a compulsory encounter. So with the lower court's ruling in place, that would have significant implications where police officers frequently engage in voluntary discussion and consensual encounters with people where Fourth Amendment protections would not apply because it was not considered compulsory. Here we have an officer who was standing behind. He was not in the line of sight. He made a decision to stand behind to speak in what he identified as a normal tone of voice to request Mr. McGovern come with him. There was no directive. There was no command. And as he stated, he was at pains not to appear to be aggressive. And the officer himself acknowledged that he did not believe in an admission that there was probable cause to arrest for unlawful entry because he was never attempting to lay the predicate for that arrest. The video seems to me anyway, if my memory is right, he wasn't directly behind him. He was off to the side. Behind him, but off to the side. He's outside of his line of vision. He's standing behind to the side of him, but not adjacent to the side. But she's standing on McGovern's shoulder. McGovern doesn't make sure that he's still looking this way. He doesn't turn. He does not turn. The person could have been anyone. The officer didn't say I'm a police officer, didn't say I'm speaking on behalf of GW. It could have been just a disgruntled audience member. It could be anyone. And in this area of the law, it's important to act with precision for police officers or for anyone who's issuing a directive to quit to, in fact, issue that directive. There was no show of it. Can I say something about unlawful entry? That's not the issue. I'm sorry, Your Honor? Unlawful entry is not the issue. Unlawful entry, refusal to quit, not a lawful entry ad initio. So it's the issue in this case is unlawful entry, refusal to quit, but the lower court erred by applying Ortberg, which is unlawful entry ad initio, unlawful entry upon entry, where the will of the owner may be manifest through implied but not expressed means. That has never been applied to the offense of unlawful entry refusal to quit, which is a different offense in the same statute. Thank you. May it please the Court, I'm Nicholas McConnell on behalf of George Washington University and the other appellees. Before we delve into the key issue in the case, whether probable cause existed for the arrest of Mr. McGovern, there are three items that are not before the Court. First, there are no First Amendment claims left in this case. The plaintiff concedes as much in the reply brief at footnote 5 on page 28 of the brief. Second, the only excessive force claim in the case is that related to the removal of Mr. McGovern from the auditorium. In the court below, in the reply brief in this case, an emphasis was placed on activity that occurred once Mr. McGovern had left the auditorium and was off videotape. In the court below, in the statement of material facts, undisputed material facts, the defendants, appellees, asserted that there were no further physical activities complained of outside the auditorium. So we're looking at a case that's on videotape. Do you agree with your friend's argument that the law makes a distinction between the type of communication that needs to be made by the property holder, in the first instance, ab initio, and the type of communication that needs to be made when the property owner is requiring someone to quit? I do not, Your Honor. It seems to me that the cases that do look at the second prong of the unlawful entry statute make it clear that the verbal formulation of Ortberg has been applied by the courts in the second refusal to leave circumstance. So there can be an implied direction to quit, you think? Correct. Yes, Your Honor. And I think that's quite clear from the cases. For example, the Bertschi v. U.S. case, which we cite, 569 Atlantic 2nd, where the D.C. Court of Appeals was addressing a person who was on a tour in the White House. And it was an organized tour, and there's a path through the White House that they were required to follow, and they were instructed or it was understood. Does your argument turn on that distinction, or is your argument that there was actually an expressed direction to quit? I believe it's an expressed direction. Sir, can you please come with me? Under the totality of the circumstances, there's only one way that that could be understood, by a person standing in the middle of an audience in the midst of a formal presentation. What do you do with your opponent's argument that an invitee to an event like this would have no reason to know that standing silently was going to be construed as a disruption of the event? Well – When other similar events, there's – it's encouraged. It's a matter of common sense, Your Honor. This is a formal presentation by the Secretary of State in front of – In what way was this disruptive? He was quiet. He was standing in the middle of an audience for the purpose – his own declared purpose was – in his deposition testimony – was to demonstrate against what he thought was false, improper adulation directed toward the Secretary of State as a result of the applause she received when she was announced as a speaker. He said he had an instant flashback to his service in Russia, where he had seen audiences wildly applauding Russian figures. GW Policy speaks about – must give the speaker a respectful hearing, right? Yes. And that implies the right – What in the world does that mean? Does that mean you don't fall asleep in the audience? It means you don't disrupt others who are present to see and hear this presentation. By standing in the midst of an audience – And was there evidence that he was disruptive of others? He certainly was, Your Honor. That was his intent. How so? Not his intent, but that he actually was disruptive. Yes. Yes, he's standing up in the front of people. He's in the middle of an audience, standing up in the middle of a formal presentation. Part of the right to hear and attend this event is not only to hear what the speaker is saying, but to see the speaker during the address. There were people in that audience behind this individual who, for his own motivations, has decided to stand up and stage a protest in the middle of an event. And was there evidence that they felt that their experience at the event had been disruptive? Well, we don't know, Your Honor. Okay, then the answer is no. No, except for the fact we're looking at this from the viewpoint of the officers themselves, what is reasonable under the circumstances. This is a room filled with people who have come to see this presentation. So do officers get to decide whether it's disruptive or not? Under the circumstances, they would, Your Honor, yes. And where do we get to the disruptive element? I mean, the policy talks about must give the speaker a respectful hearing. Yes. How do we leap from there to disruption? Well, the thing is, other members of the audience are entitled. They have a right as well. No, I'm sorry. Maybe I'm just missing it. Is there a policy? I just read from the GW policy. Must give the speaker a respectful hearing. Remind me how we get from there to disruption. Disruption seems to be a particular form of... Standing up in the middle of a formal presentation while other people are trying to focus their attention. Is this disrespectful toward the speaker? And turning his back. Yes. There's a story about Learned Hand where during an oral argument, like we have here, one of his law clerks comes in, hands him a memo, and he swung his chair around and started reading it. And the attorney who was arguing it, who was Wayman Kirkland, Kirkland and Ellis, stopped talking. And Hand went, continue, Mr. Kirkland. And Kirkland said, I speak to no man's back. And Hand swung around. And that's an illustration of why it was disrespectful. Would it be if Mr. McGovern had fallen asleep during Secretary Clinton's remarks? Would that have been disrespectful? So long as he's not disturbing people around him. Where do we get the disturbing, Ellis? That's what I'm getting to. Where is the disturbance? The act is standing up. Where do we look for the language that disruption is a violation of policy? Is that in policy or is that just a common sense application? It's a common sense application of the nature of the event. This is an event on private property at the university. People were invited through Mr. McGovern, through Artifice. Were there other events where people were allowed to speak out and they weren't asked to leave? Correct. Where it was clear that the speaker himself or herself was inviting that sort of exchange, impromptu exchange. The example was a controversial figure like Professor Cornel West appears, and he wants to engage with the audience. That's the whole purpose. This is quite a different event. You know that Secretary Clinton didn't want anyone standing and turning their back on her. Well, it's a matter of what they observed happening. The invitation to the event, by the way. I mean, he started standing from the beginning, right? Everyone was standing. Everyone stood up. Then they sat down and remained standing. Did Secretary Clinton acknowledge that he was there? Did it pose any problem to her? No. She continued to speak on videotape. But it's obvious that other members, if you review the videotape, and a key part of this case is this event is videotaped, looking at the videotape, the reaction of audience members can be seen. They are being distracted by the fact that Mr. McGovern has stood up, taken his coat off, taken his shirt off, wearing a T-shirt with a statement of some kind on it. Before you run out of time, I want to go back to another question. What was the – I've forgotten. What was the – tell me about the T-shirt he was wearing. It was a T-shirt with a slogan of some kind on it. It wasn't – and we're not into a content – we're not into a content First Amendment-type argument. No, no, that's not why I'm asking. That wasn't the important point. That's not why I'm asking. Was the content on the back of the shirt? It was on the front. So he's – the content on his shirt, if I recall correctly, is toward audience members who are now behind him looking at this. And he took off – he had a jacket on? He had a jacket. And he took that off to display the T-shirt. He had a jacket and a shirt, both of which he took off. Now, all we're talking about here is probable cause, right? Correct. If a police officer saw that and said, well, this guy came into this auditorium for the purpose of putting on a protest, and we don't allow that – at least I think there's probable cause that he is, you know, disrupting the event or whatever because we're not – that's all we're talking about. Is that part of your – is that idea – that's not – That is clearly part of the record, Your Honor. It's not refusal to leave. It's that it's an unlawful entry for that reason. In part. And probable cause. Correct. And the law is such that the police officer expressing or having probable cause doesn't have to know exactly what crime somebody is committing as long as there's probable cause to believe some crimes. Which is the other important piece of this. We haven't talked about it yet. That's the security element of this. Even Mr. McGovern concedes, as a high-level CIA former official briefing presidents daily, the security for this event was, as he described it, as tight as any as he had ever seen. He's in a very small auditorium. He's 30 feet away from the Secretary of State. He suddenly stands up, having disrobed. He didn't suddenly stand up. I thought everybody stood up and applauded. Stood up and applauded. When Secretary – and then he didn't sit down. Correct. I stand corrected. You're correct, Your Honor. What's the probable cause to arrest for what? Probable cause for disruption of the event, refusal to leave. What's the statutory prescription upon which you're reliant? The principal reliance here is on the refusal to quit portion of the unlawful entry statute. Are they disjunctive? Excuse me? Are they disjunctive, unlawful entry and the refusal to quit? Are they disjunctive? No. It can be both. Can it be both? Must it be both? No. No. Violation of either portion of the statute is sufficient to trigger the statute itself. If you enter lawfully but then fail to comply with a lawful request to quit, you've violated the statute. You can enter with an unlawful purpose, and there is some basis in this record to think Mr. McGovern did do that. Does that mean every trespass in the District of Columbia is a crime? Technically, yes, under the statute. If you do not have permission to enter property and you trespass on that property, technically you have violated the statute. If I'm walking along the sidewalk and the sidewalk is broken up or something, and I go around it onto somebody's front yard, I'm committing a criminal offense? Interesting question. Under the statute, potentially. Why would the excessive force portion of this not go to a jury? It's an objective standard, Your Honor. The videotape is there to be reviewed. The Court of Appeals, this Court has approved, or the lower court has approved, the use of force matrix that clearly encompasses the level of force used by the officers under these circumstances. Refusal to acknowledge the presence of the police officer is quite clear from the videotape, and courts are as the Supreme Court has instructed. Well, that wouldn't justify excessive force. Excuse me? That wouldn't justify excessive force. If there were excessive force. Well, isn't that a question that a jury would decide in these circumstances? At least at a threshold level, that's a legal issue for the courts to take a look at. They do that. I suppose I'd take a look at it, and I'm not sure. I think it can go either way. Well, the issue there, Your Honor, is the application of the matrix. What was the conduct? What is the objective standard? The use of force is an objective standard. That's the teaching from the Supreme Court in terms of whether the force used under the circumstances was reasonable. It's an objective test that the courts do and can and do apply in the first instance. That is a question that never goes to the jury? No. No, it can. Of course it can. Of course it can. So that's what I'm saying. Why wouldn't it go in this case? Because we can. I think it's close. I can't decide on any matrix. Looking at the videotape and looking at the matrix on what force was actually applied here, it can be seen that the police officers are using the least amount of force necessary to accomplish the purpose once. That's your argument? Yes. Yes, Your Honor. And I think it's visible from the tape. I suppose that's debatable. It goes to a jury. If, in fact, the court applying an objective standard looked at the tape and said, there is a question here as to whether or not this amount of force was unreasonable, that would be a jury question. I agree, Your Honor. But that is what courts do. They look at the evidence. They assess it. They apply an objective test. No, this use of force, whatever force, may get to a point that a jury question arises. Clearly, we can say, looking at what happened here, these officers are acting appropriately and responsibly. Okay. Thank you very much. Thank you, Your Honor. I'll give back two minutes for rebuttal. Thank you, Your Honor. Very quickly, if I could reference the joint appendix to address the question that Your Honor was asking. At JA 406, 407, Defendant Glaubach stated that there is no description or definition published to the public as to what conduct will be considered acceptable or unacceptable by GW police, so that there is no way for the public to know that what they are doing would somehow be in violation of a policy. You can't go so far with that, can you? Suppose he came in with lots of soda, and he was clearly angry about something, and just threw it up in the air and splashed everyone behind him. You'd have no reason to know that that might cause him to be ejected? Oh, I would not argue that, and I'm certainly not arguing that here. Well, how do you draw the line on the argument you were just raising? It's not published anywhere. GW doesn't have anything about throwing soda during events. If I can finish the point that I was making, it may answer that question more clearly. Because additionally, they testify that conduct that's acceptable at events varies from event to event at 406, 407. And at 369, 370, the Assistant Chief testified that if they had Cornel West here, or somebody that controversial, and they say, I want people, I want feedback, I want heated arguments, that would be okay. So my reference to the point as to what's published in terms of acceptable or unacceptable conduct, when we're talking about someone standing or turning their back, there is no way for an audience member to know that a silent act of dissent is going to automatically imply. Let me give you the answer. On the Cornel West, anyone who goes to a Cornel West event knows that he wants you yelling and screaming and taking him on. And you may end up in there by accident and not realize it, but then you'd probably get engaged with the rest of the crowd. Anyone going to the Secretary of State's speech, I would say, would assume that that is not permissible conduct. Common sense would tell you you don't need a brochure that says, okay, in this event we expect you to be respectful. Well, yelling and screaming perhaps, but I would not assume that Secretary of State Clinton is blocking the view of others, standing and blocking. It's an intention. It's obvious what's being done. He's obviously intending to make a statement. Now, the problem is he's blocking the view of others and doing it purposefully. One would assume that's not acceptable conduct, yes? I wouldn't assume the Secretary's Really? You wouldn't assume if you went to an event like this, if you stood up, turned around and blocked the view of those behind you, that people might wonder why you're doing that? That's rude and not acceptable given the nature of the event? I guess what I'm referring to is your question as to what the speaker is finding welcome or unwelcome. I don't know that Secretary Clinton, we don't know that that would be considered a silent act of dissent, would be considered unwelcome. In the record, there were no complaints that anyone's view was blocked. What was the message on the T-shirt? It simply said Veterans for Peace. That was the message. It was on the front of the T-shirt? It was on the front of the T-shirt. But on the issue of the directive to quit, because what I was referencing just had to go with whether or not there could be unlawful entry out of an issue as opposed to a directive to quit being issued, we believe in here when someone was present that they had to be divested of their license to be present without other knowledge being issued by the police officer, no directive being given by the police officer. And O'Brien, VDC, and Murphy- When I'm on someone else's property and they come to me and say, you must leave, that's it. Game's up, right? They don't have to show me that in 10 other instances where somebody was similarly situated to me that they acted the same way. They could be arbitrary, right? Oh, I agree with you, Your Honor. So that's why I come back to the original question is if we come to the conclusion that he was asked to leave when they said, please come with me, if that is a directive from the property owner to vacate, to leave, the case is resolved on that ground. I agree with you that if someone had said, you must leave, there would be no dispute. But as I was referencing, for example, in U.S. v. Mendenhall, there you have federal agents, DEA agents who spoke to someone and said, can you please come with me? She came with them. They identified themselves as agents. And that was considered consensual. So there's a body of law addressing. If I find a stranger in my living room when I get home today, I have to first say, please leave? I just can't kick them out? If the stranger was in your living room initially, that would be unlawful entry ab initio, unlawful entry at the onset upon entry, as opposed to you invited someone in and they had a few drinks too many and you wanted them to leave, at which point you need to say, get out of my house. So it's two different unlawful entry offenses. Thank you very much. Thank you. The case is submitted.
judges: Griffith, Edwards, Randolph